T.C. Memo. 1996-451

UNITED STATES TAX COURT

GROUP ADMINISTRATION PREMIUM SERVICES, INC., ET AL.,[1]
Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16405-93, 16430-93,    Filed October 3, 1996.
       16435-93.

<u>Edward J. Gildea</u>, for petitioners.

<u>Claire R. McKenzie</u> and <u>Patricia Pierce Davis</u>, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined the following

deficiencies in, additions to, and penalty on petitioners'

Federal income taxes for the year 1989:

---

[1]Cases of the following petitioners are consolidated
herewith:  Jerome J. and Joanne L. Mancuso, docket No. 16430-93;
and Jerome J. Mancuso & Associates, Inc., docket No. 16435-93.

|  | | Additions and Penalty | | |
| Petitioner | Deficiency | Sec. 6651(a) | Sec. 6655 | Sec. 6662(b)(1) |
| Group Administration Premium Services, Inc. | $23,201 | $5,800.25 | $1,543 | --- |
| Jerome J. and Joanne L. Mancuso | 39,446 | 9,668.00 | --- | $7,998.29 |
| Jerome J. Mancuso & Associates, Inc. | 5,845 | 1,461.25 | 389 | --- |

The cases were consolidated for trial, briefing, and opinion. All references to petitioner are to Jerome J. Mancuso. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by the parties, the issues remaining for decision are: (1) Whether petitioner corporations Group Administration Premium Services, Inc. (GAPS), and Jerome J. Mancuso & Associates, Inc. (JJM), are entitled to expense deductions in excess of the amounts allowed in the notices of deficiency and conceded by respondent; (2) whether GAPS's and JJM's payments to petitioner, and on his behalf, were repayments of shareholder loans or corporate distributions; and (3) whether the respective petitioners are liable for the following: (a) all petitioners for the addition to tax under section 6651(a)(1) for failure to file timely income tax returns; (b) petitioners Jerome J. and Joanne L. Mancuso for the accuracy-related penalty

under section 6662(b)(1) for negligence or disregard of rules and regulations; and (c) GAPS and JJM for additions to tax under section 6655 for failure to pay estimated tax.

We hold that: (1) GAPS and JJM are not entitled to any additional expense deductions; (2) the payments by GAPS and JJM were corporate distributions--dividends to the extent of earnings and profits, returns of capital to the extent of petitioner's basis in his shares, and capital gains as to the remaining amounts; and (3) the respective petitioners are liable for the additions to tax and penalty, in amounts to be determined by Rule 155 computations.

FINDINGS OF FACT

The parties have stipulated some of the facts, and the stipulations of facts and attached exhibits are incorporated in this opinion. Petitioners Jerome J. and Joanne L. Mancuso resided in Glenview, Illinois, when they filed their petition in this case. GAPS and JJM maintained their principal places of business in Arlington Heights, Illinois, when they filed their petitions. At all relevant times, petitioner was the sole shareholder and director and president of both GAPS and JJM, which were accrual basis taxpayers. Petitioner and Joanne L. Mancuso are cash basis taxpayers.

Petitioner has been an insurance agent/broker since 1969. Prior to 1986, petitioner conducted his insurance business as a

sole proprietor under the name of J.J. Mancuso & Associates. Petitioner's business was divided into two lines: Group employee benefit plans and individual life and disability contracts.

In late 1985, petitioner purchased a corporation named Rapid Dictation Service, Inc. (Rapid Dictation), from an attorney for less than $500. Petitioner believed, based on the seller's representations, that the name of Rapid Dictation was changed to Group Administration Premium Services, Inc., sometime in early 1986 and that it was a corporation in good standing under Illinois law.

Early in 1986, petitioner began to conduct a portion of his business under the name GAPS. Petitioner intended to use GAPS to sell and administer all group employee benefit plans of his clients. From 1986 to March 1, 1989, petitioner continued to operate Rapid Dictation, under the name GAPS, on the basis of his belief that it was a valid corporation.

In February 1989, petitioner's then attorney advised him that Rapid Dictation was an invalid corporation and that a new corporation should be organized. On March 1, 1989, GAPS filed articles of incorporation with the Illinois secretary of state.

On March 7, 1989, petitioner, acting as sole director, transferred to the newly organized corporation GAPS all of the assets and liabilities of the business that he had been conducting under the name of GAPS. These assets consisted of two bank accounts containing $154,000 and furniture and equipment

valued by petitioner at $100,000.  Both the bank accounts and the furniture and equipment had been used by petitioner while he was operating under the name of GAPS.  Sometime after the incorporation of GAPS in March 1989, petitioner also transferred $1,000 to GAPS in exchange for 1,000 shares of GAPS common stock.

The bank accounts transferred by petitioner to GAPS were the claims account and the premium account.  The claims account was an account through which funds flowed from employers and insurance carriers to employee beneficiaries and service providers.  The premium account was a collection account that was used to bill employers, collect premiums, and remit net premiums to insurance carriers.

Petitioner and his accountant, John Pritten, prepared 10 promissory notes from GAPS to petitioner.  All of the notes are preprinted "fill in the blank" promissory notes.  Each of the notes bears a typed-in issuance date and due date and a stamped cancellation date and purports to bear interest at 5.25 percent.[2]

---

[2]Copies of the notes assembled as petitioners' Exhibit 109 also show the following:

| NOTE NUMBER | AMOUNT | ISSUANCE | DUE DATE | CANCELED |
|---|---|---|---|---|
| 1 | $23,364.36 | 1/1/86 | 12/31/86 | 12/31/?? |
| 2 | 30,313.13 | 12/31/86 | 12/31/87 | 12/31/87 |
| 3 | 104,427.00 | 12/31/87 | 12/31/88 | 12/31/88 |
| 4 | 48,686.21 | 12/31/87 | 12/31/88 | 12/31/88 |
| 5 | 57,857.81 | 12/31/88 | 12/31/89 | 12/31/89 |
| 6 | 31,637.00 | 12/31/88 | 12/31/89 | 12/31/89 |
| 7 | 38,686.21 | 12/31/88 | 12/31/89 | 12/31/89 |

All of the notes are signed, in what appears to be the same ink, by petitioner as president of GAPS.  On Schedule L of its 1988 and 1989 U.S. corporation income tax return forms, GAPS showed liabilities as of the beginning and end of each year in the following amounts:

| Schedule L Entry as of: | 1/1/88 | 12/31/88 | 1/1/89 | 12/31/89 |
|---|---|---|---|---|
| Loans from stockholders | --- | --- | --- | $8,281 |
| Notes payable in less than 1 yr. | $36,427 | $31,637 | $31,637 | 16,356 |
| Notes payable in 1 yr. or more | 48,686 | 38,686 | 38,686 | 38,686 |

In 1989, GAPS paid $119,760 either directly to petitioner or on his and his family's behalf.[3]  In 1989, GAPS had $65,376 of

| 8 | 17,061.02 | 12/31/89 | 12/31/90 | 12/31/90 |
| 9 | 8,281.04 | 12/31/89 | 12/21/90 | 12/31/90 |
| 10 | 38,686.05 | 12/31/89 | 12/31/90 | 12/31/90 |

[3]The parties introduced stipulated Exhibit 14-N which purports to include the total amounts of corporate payments made by GAPS and JJM to petitioner or on his or his family's behalf. The amounts and applications of all corporate payments to petitioner were as follows:

| DESCRIPTION | AMOUNT | DESCRIPTION | AMOUNT |
|---|---|---|---|
| Auto payments | $6,887.76 | Cable | $645.90 |
| Home insurance | 971.00 | ConEd | 1,949.28 |
| Home insurance | 2,060.00 | Gas | 1,882.21 |
| Carsons | 2,484.86 | Telephone | 1,650.33 |
| Chembank | 9,461.73 | Equipment | 14,383.11 |
| Fields | 1,576.81 | Advertising | 2,394.47 |
| Sears | 440.19 | Commissions | 47,140.49 |
| State use tax | 525.00 | Personal auto | 395.00 |

earnings and profits available for distribution to shareholders.
See infra pp. 23-27.

On February 24, 1987, petitioner incorporated the individual
life and disability portion of his business under the name
Jerome J. Mancuso & Associates, Inc. (JJM).  Petitioner
transferred $1,000 to JJM in exchange for 1,000 shares of JJM
common stock.  Petitioner also transferred to JJM a $20,000 bank
deposit, an account receivable of $16,000, and office furniture,
fixtures, and equipment valued by petitioner at $37,000.

Petitioner and Mr. Pritten prepared six promissory notes
from JJM to petitioner.  All of the notes issued by JJM are
preprinted "fill in the blank" promissory notes and signed in

| Residential | 9,389.13 | Telephone/Sprint | 782.86 |
| Cash-personal | 61,553.50 | Legal/prof. | 2,100.00 |
| Bonus-JJM | 13,064.20 | Travel/ent. | 27,666.94 |
| Medical/dental | 1,889.47 | Repairs | 156.00 |

The total of all payments listed in Exhibit 14-N is
$211,450.  Respondent contends that the amounts contained in
Exhibit 14-N should be increased by $930.11 for the payment of
petitioner's auto insurance.  With this amount added to the
amounts in Exhibit 14-N, the total payments amount to $212,380.

We do not know which payments were made by JJM and which
payments were made by GAPS.  Petitioner used one operating
account, in the name of JJM, to make all the payments.
Consequently, all the copied checks attached to Exhibit 14-N are
JJM checks.  Exhibit 14-N does not differentiate between payments
made by GAPS and JJM, and respondent never apportioned the
specific payments between the two corporations.  Of the $212,380,
we have apportioned $119,760 as the amount of the payments from
GAPS and $92,620 as the amount of the payments from JJM.  For a
discussion of how we apportioned the total payments between GAPS
and JJM, see infra note 8.

what appears to be the same ink as the GAPS notes.  Each of the notes bears a typed-in issuance date and due date and a stamped cancellation date, and purports to bear interest at 5.25 percent.[4]  All the JJM notes are signed by petitioner as president of JJM.  On Schedule L of its 1988 and 1989 U.S. corporation income tax return forms, JJM showed liabilities as of the beginning and end of each year in the following amounts:

| Schedule L Entry as of: | 1/1/88 | 12/31/88 | 1/1/89 | 12/31/89 |
| --- | --- | --- | --- | --- |
| Loans from stockholders | $14,735 | $10,000 | $10,000 | $10,000 |
| Notes payable in less than 1 yr. | --- | 9,000 | 9,000 | 15,208 |
| Notes payable in 1 yr. or more | --- | 54,381 | 54,381 | 44,381 |

In 1989, JJM paid a total of $92,620 to petitioner or third parties for petitioner's or his family's benefit.  See _supra_ note 3.  In 1989, JJM had $22,257 of earnings and profits available for distribution to shareholders.  See _infra_ pp. 23-27.

Some of the corporate payments to, or on behalf of, petitioner were also deducted by the corporations as ordinary and

---

[4]Copies of the notes assembled as petitioners' Exhibit 108 also show the following:

| NOTE NUMBER | AMOUNT | ISSUANCE | DUE DATE | CANCELED |
| --- | --- | --- | --- | --- |
| 1 | $40,715.00 | 12/31/87 | 12/31/88 | 12/31/88 |
| 2 | 14,735.00 | 12/31/87 | 12/31/88 | 12/31/88 |
| 3 | 19,000.00 | 12/31/88 | 12/31/89 | 12/31/89 |
| 4 | 54,381.12 | 12/31/88 | 12/31/89 | 12/31/89 |
| 5 | 15,208.00 | 12/31/89 | 12/31/90 | 12/31/90 |
| 6 | 44,381.00 | 12/31/89 | 12/31/90 | 12/31/90 |

necessary business expenses.  They include payment by GAPS and JJM for several of petitioner's trips during 1989.[5]  In total, respondent disallowed expense deductions of $104,411 and $39,607 claimed by GAPS and JJM, respectively.

On the Mancusos' 1989 individual income tax return, Form 1040, petitioner reported wages of $4,000 from JJM and nonemployee compensation of $6,259 from GAPS.  Petitioner also maintained an independent insurance agent license with Massachusetts Mutual Insurance Co. (Mass Mutual); in 1989 petitioner earned gross wages from Mass Mutual, which he reported on his 1989 Form 1040.  After deductions and withholdings, petitioner received net wages of $39,117.98, $38,412 of which he deposited into the bank account of one of the corporate petitioners.[6]

The Mancusos' 1989 individual tax return, Form 1040, was due on April 15, 1990.  The Mancusos did not request an extension of time to file their 1989 Form 1040.  On August 28, 1990, the

---

[5]Petitioner traveled to Kansas City, Missouri, from Mar. 3 through 5.  He also traveled to Denver, Colorado, from Mar. 23 through 26.  From June 11 through 18, petitioner traveled to Lake Wales, Florida.  From July 19 through 20, petitioner traveled to Sacramento, California.  Finally, petitioner made three more Denver, Colorado, trips from Aug. 27-28, Sept. 9 through 13, and Nov. 3 through 5, respectively.

[6]The record is unclear as to which corporate account actually received the deposit. Because petitioner used the JJM operating account for both corporations, we assume that the funds were deposited in this account.

Mancusos signed and mailed their 1989 Form 1040 to the IRS Kansas City Service Center, which received it on August 30, 1990.

GAPS's and JJM's 1989 U.S. Corporation Income Tax Returns, Forms 1120, were due on March 15, 1990. GAPS and JJM did not request extensions of time to file these returns, and the IRS Kansas City Service Center never received them. On September 20, 1992, GAPS and JJM provided unsigned copies of these returns, bearing their names, to the revenue agent conducting the GAPS examination (the GAPS and JJM pro forma returns, respectively). Neither of the pro forma returns showed taxable income or tax due, and neither GAPS nor JJM made any estimated tax payments for the taxable year 1989.

OPINION

This case is another banal example of a sole shareholder who used his C corporations not only to carry on his business but also as personal pocketbooks without observing corporate formalities and record-keeping requirements. Petitioner used GAPS and JJM to pay his and his family's personal living expenses. Petitioner has claimed some of these payments as repayments of shareholder loans, thereby not recognizing income at the individual level, while the corporate petitioners that he controlled claimed some of the same payments as business expense deductions, thereby reducing income taxes that should have been reported at the corporate level. By claiming some of these same

payments as both corporate expense deductions and repayments of loans, petitioners have tried to avoid tax at both the corporate and individual levels.[7]  Of course, to the extent the corporate payments were for ordinary and necessary business expenses of the corporate payor, they would reduce income tax at the corporate level, while if they were truly repayments of bona fide loans, they would not be includable in petitioners' income.  However, petitioner has tried to have it both ways, treating the same payments as both corporate expense deductions at the corporate level and repayment of loans at the individual level.

We realize that shareholders of closely held C corporations often withdraw substantial amounts of corporate earnings as salaries, which the corporations deduct, thereby reducing income tax at the corporate level, and sometimes raising the question whether the salaries are reasonable.  By contrast, petitioner has reported relatively small amounts of compensation from JJM and GAPS, while those corporations have claimed their payments of his personal living expenses as business deductions.  If allowed to

---

[7]Respondent determined in her statutory notice that GAPS and JJM paid a total of $212,380 in 1989 to petitioner or on his or his family's behalf.  Respondent also disallowed, in the corporations' statutory notices, $144,411 of corporate expense deductions claimed on the corporations' 1989 pro forma U.S. corporation income tax returns.  Therefore, $144,411 of the $212,380 paid to petitioner by GAPS and JJM were also deducted by the corporations at the corporate level.  In addition, the Mancusos reported only $10,259 as compensation to petitioner from the corporations ($4,000 wages from JJM and $6,259 non-employee compensation from GAPS) on their 1989 Form 1040.

stand, what petitioner and his corporations have done would make corporate income disappear completely from the income tax system.

Although these cases concern taxes at both the corporate and individual levels, and were properly consolidated for trial, briefing, and opinion, respondent's and petitioners' presentations have blurred the corporate and individual tax issues. For example, the relationships between the disallowed corporate deductions and the corporate payments to petitioner are not shown anywhere in the record. We have the $212,380 total of the corporate payments in joint exhibit 14-N. However, we are unable to determine how respondent apportioned the $212,380 total amount of corporate payments listed in exhibit 14-N between GAPS and JJM. At trial and on brief, respondent continually referred to GAPS and JJM as one entity for purposes of determining the amount of corporate distributions. However, the statutory notice apportions corporate distributions between GAPS and JJM, in the amounts of $105,220 and $40,208, respectively. We have had to review a spotty record to try to glean the actual amounts that GAPS and JJM each paid to and for petitioner.[8]

_____

[8]Respondent made two adjustments to the amount of total payments of $212,380.35 to arrive at the amounts of taxable corporate distributions determined in the statutory notice. One of the adjustments was for the amounts listed as shareholder loans on the GAPS and JJM corporate income tax returns for 1989. The other adjustment was for amounts that petitioner reported on his individual return. This included the $38,412 of payments from Mass Mutual deposited in the corporate account, the $4,000 of wages from JJM, and the $6,259 of non-employee compensation

(continued...)

Issue 1.  Corporate Expense Deductions

The corporate petitioners bear the burden of establishing that they are entitled to the deductions claimed on their 1989 pro forma tax returns.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  After concessions by the parties, four business expense categories remain in issue.

---

[8](...continued)
from GAPS.  However, respondent did not apportion the adjustments between the corporations, instead reducing the total amount of payments by the total amount of adjustments to arrive at a total amount of $145,428 in corporate distributions.  Only at this point did respondent apportion this amount between the two corporations to arrive at the amounts of $105,220 and $40,208 for GAPS and JJM respectively.

We have worked backwards from the amounts of $105,220 and $40,208 to reapportion the $212,380 between GAPS and JJM, assuming that petitioner deposited his Mass Mutual wage payments in the JJM account.  We therefore assume that respondent reduced the JJM payments by this amount.  It is clear from the record that the $4,000 in wages and the loan amount of $10,000 are allocable to JJM.  We have likewise assumed that the $6,259 of non-employee compensation was from GAPS.  It is clear from the record that the loan amount of $8,281 is allocable to GAPS.  With these adjustments we arrive at the following amounts:

|  | GAPS | JJM |
|---|---|---|
| Amount of distribution in statutory notice | $105,220 | $40,208 |
| Non-employee compensation and wages | 6,259 | 4,000 |
| Mass Mutual payments | --- | 38,412 |
| Shareholder loans reflected on the Schedules L | 8,281 | 10,000 |
| Total payments | 119,760 | 92,620 |

At trial, respondent allowed an additional reduction in the amount of distributions for advertising expenses and conceded additional deductions therefor of $655 and $656 by JJM and GAPS, respectively.

There remain in issue $7,000 for GAPS and $5,000 for JJM for the salary/wage category, and $949 for GAPS for the legal/ professional category. Neither GAPS nor JJM produced any evidence, beyond their 1989 pro forma tax returns, that they incurred these additional salaries/wages and legal/professional fees. Petitioners introduced no evidence concerning the nature and business purpose of the alleged salaries and wages. Petitioners made no argument in either their opening or reply brief on either issue. Petitioners have failed to meet their burden of proof on the additional salaries and wages and the additional legal and professional fees. Therefore, we uphold respondent's determinations on these issues.

Respondent allowed all deductions for corporate supplies, and the only amounts still at issue in this case are additional office expenses for GAPS of $1,277, and for JJM of $1,502. In support of these additional expenses, petitioners proffered exhibit 102, a purported summary and compilation of receipts evidencing business expenses. Petitioners claim that exhibit 102 supports these additional deductions. Respondent objected to exhibit 102 at trial, and renewed her objection on brief, on the grounds of relevancy, completeness, and hearsay. Although we reserved ruling on this objection, we find it unnecessary to rule. Even if exhibit 102 were admitted, it would not establish the deductibility of the additional office expenses. The first page of exhibit 102 is a purported summary of the amounts still

at issue. However, the summary is titled "supplies", and there are no disputed deductions on the supplies issue.

Exhibit 102 is most deficient, however, with respect to the copies of the receipts included therein. There is no indication of the relationship between the additional expenses and the corporations' business. In order to be deductible, a business expense must be an ordinary and necessary expense of doing business. Sec. 162(a). The receipts do not show the ordinary and necessary business purposes of the expenses, but rather reflect mostly personal items, including groceries and minor office supply items. Even with the supply items listed, there is no way to determine whether these receipts correspond to the additional deductions claimed. Exhibit 102 does not carry petitioners' burden of substantiating the office expense deductions. Therefore, we uphold respondent's determination on the office expenses.

Petitioners claim additional travel and entertainment expenses for GAPS of $11,119 and for JJM of $3,565. Petitioners' claim that exhibit 104 supports these deductions. Respondent objects to the exhibit on the grounds of relevancy, lack of completeness, hearsay, and lack of trustworthiness.

As with exhibit 102, we find it unnecessary to rule on respondent's objection, because the evidence on the claimed travel and entertainment deductions is similarly deficient. Even

if admitted, exhibit 104 would not prove the deductibility of the additional travel and entertainment expenses.  In addition to petitioners' burden under section 162(a) of proving that the expenses were ordinary and necessary business expenses, section 274(d) imposes a stringent substantiation requirement for deductions for travel and entertainment expenses.  Under section 274(d), no deduction will be allowed for travel and entertainment expenses unless the taxpayer substantiates these expenses by adequate records or by sufficient evidence corroborating the taxpayer's own statement regarding:  (1) The amount of such expense or other item; (2) the time and the place of the travel and entertainment; (3) the business purpose of the expense; and (4) the business relationship to the taxpayer of the person entertained.  Sec. 274(d); sec. 1.274-5, Income Tax Regs.

While exhibit 104 is a fairly comprehensive compilation of airline, rental car, hotel, and entertainment receipts, none of these receipts describes the business purposes of the trips or entertainment expenses.  Petitioner's testimony is the only evidence of the business purposes of the trips, and his uncorroborated testimony of the business purposes of the trips fails to satisfy the substantiation requirements of section 274(d).  Sec. 1.274-5, Income Tax Regs.  We therefore sustain respondent's determination disallowing the travel and entertainment expenses.

Issue 2.  Corporate Payments:  Taxable Corporate Distributions or Nontaxable Loan Repayments

(a) Amounts of payments

After generous allowances by respondent, and respondent's concessions on advertising expenses, see last sentence of note 8 supra, the amounts of GAPS's and JJM's payments to petitioner or for his benefit were $104,564 and $39,553, respectively.

Petitioners did not present any evidence of the amounts of money and other property that GAPS and JJM paid to petitioner, or on his or his family's behalf.  The Mancusos have not met their burden of proving that respondent's determinations of the amounts of the corporate payments are incorrect.[9]

(b) Loan Repayments or Taxable Distributions

A corporate payment to, or on behalf of, a shareholder is a corporate distribution if it is a payment made with respect to the shareholder's stock.  Sec. 301(a).  Petitioner contends that the amounts GAPS and JJM paid to him, or paid on his behalf, were nontaxable repayments of loans.

Whether the GAPS and JJM payments to petitioner were distributions with respect to their stock or loan repayments

---

[9]These amounts included respondent's determination that petitioner received constructive distributions through purported corporate commissions paid to his children by GAPS and JJM. After testimony by one of his children on this issue, which seriously undermined his credibility, petitioners conceded this issue at trial.  Petitioners presented no other evidence on the amount of distributions.

depends, in part, on whether petitioner's alleged transfers of property to GAPS and JJM in earlier years were loans or contributions to capital. The corporate payments cannot be loan repayments if there are no loans to repay. Whether an advance by a shareholder to a corporation is a loan or a contribution to capital is a question of fact, Georgia-Pac. Corp. v. Commissioner, 63 T.C. 790, 795 (1975); Magee v. Commissioner, T.C. Memo. 1993-305, and each debt-equity case must be decided on its own facts. We therefore take a facts and circumstances approach in deciding whether the payments from petitioner to GAPS and JJM were debt or equity.

When a shareholder makes an otherwise undocumented transfer of money or property to his corporation, a strong inference arises that the transfer is a contribution to capital rather than a loan. Dobkin v. Commissioner, 15 T.C. 31, 33 (1950). Petitioner bears the burden of proving that he lent the cash and furniture to GAPS and JJM. Arlington Park Jockey Club v. Sauber, 262 F.2d 902, 905 (7th Cir. 1959). In distinguishing debt from equity, courts have looked through taxpayers' labels to determine whether an advance creates a debtor-creditor relationship.

The Court of Appeals for the Seventh Circuit, to which an appeal in this case would lie, said in Commissioner v. Meridian & Thirteenth Realty Co., 132 F.2d 182, 186 (7th Cir. 1942), revg. 44 B.T.A. 865 (1941): "the essential difference between a

creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event."  In Nassau Lens Co. v. Commissioner, 308 F.2d 39, 46 (2d Cir. 1962), remanding 35 T.C. 268 (1960), the Court of Appeals for the Second Circuit observed that whatever interests a stockholder chooses to take in a corporation, whether debt or equity, should be recognized as such, "so long as that investment has substantial economic reality in terms of the objective factors which normally surround the type [of investment] chosen", and so long as it complies "with arm's-length standards".  See also Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 494 (1980) (quoting Estate of Mixon v. United States, 464 F.2d 394, 403 (5th Cir. 1972) (referring to the need to determine whether "the transaction complies with arm's length standards and normal business practice")).  These objective factors include the corporation's ability to repay and the likelihood of repayment, as well as whether the parties complied with arm's-length standards and normal business practice.

Against this background, it is clear that petitioner's transfers to GAPS and JJM were capital contributions, rather than debt.  The only evidence of loans is petitioner's and his accountant's testimony and the "fill in the blank" promissory notes.  However, there were no prepayment schedule, no source

documents, and no interest payments, and the categories and amounts shown on the Schedules L that petitioner said reflected the loan balances outstanding at yearend between him and the corporations were inconsistent with the face amounts of the corporations' notes to him.

There are no loan documents beyond "fill in the blank" promissory notes, all signed in what appears to be the same ink with the same stated interest rate. Respondent argues that these promissory notes were created in preparation for trial. Petitioner has not convinced us otherwise, nor has he proven that these notes were prepared each year to keep track of the "running balances" between himself and the corporations. We believe it more likely that these notes were created in preparation for trial to try to save the bacon that had fallen into the fire when petitioners' numbers turned up in the audit lottery.

Even if the notes were not prepared for trial, they do not evidence normal business practices. Although the notes contain maturity dates, there is no evidence, beyond cancellation stamps, that either the corporations or petitioner enforced payment at the purported maturity dates. In addition to obtaining repayment of principal, a true lender is concerned with receiving interest. Curry v. United States, 396 F.2d 630, 634 (5th Cir. 1968). Although there was stated interest on the notes of 5.25 percent,

there is no evidence that any interest was ever paid.[10]  In addition, the rate of interest on the notes did not change, although quoted interest rates were changing during the 3-year period when the notes purported to be outstanding.  This is not evidence of normal business practice.

There are no source documents evidencing a loan.  Both petitioner and his accountant referred to internal accounting records and work papers when asked how each of the 16 loan balances was calculated.  Petitioner never offered these internal accounting documents into evidence.  Petitioner stated that these records were available but that he would have to find them.  Petitioners never produced them.

There are many inconsistencies between the categories and amounts shown on the Schedules L that petitioner said reflected the loan balances outstanding at yearend between him and the corporations and the face amounts of the corporations' notes to him.  The corporate Schedules L do not show significant loans from stockholders.  GAPS showed no loans from stockholders as of

_____

[10]GAPS claimed an interest deduction of $30,632 on its 1989 pro forma tax return.  Respondent disallowed this entire amount, and GAPS has conceded this issue.  Even if this interest was paid, there is no evidence that it was paid to petitioner for these purported loans.  Even if the interest was paid to petitioner for these purported loans, petitioners did not report these payments as ordinary income.  If the deduction was based upon an accrual of interest payable to petitioner, the deduction would properly be disallowed under sec. 267(a)(2) by reason of the relationship between petitioner and GAPS, as defined in sec. 267(b)(2).

January 1, 1988, or as of December 31, 1988, on its 1988 Schedule
L.  JJM showed no loans from stockholders as of January 1, 1988,
or as of December 31, 1988, on its 1988 Schedule L.  On the 1989
Schedule L, GAPS showed loans from stockholders of zero on
January 1, 1989, and $8,281 as of December 31, 1989.  On the 1989
Schedule L, JJM showed loans from stockholders of $10,000 on
January 1, 1989, and $10,000 as of December 31, 1989.[11]  The
Schedule Ls do not evidence sufficient loans to cover the
payments made by GAPS and JJM to and for petitioner.[12]

---

[11]In the statutory notice, respondent generously reduced the
amounts of corporate payments by the amounts of the stockholder's
loans listed on GAPS's and JJM's 1989 pro forma corporate income
tax return schedule L.  Petitioners provided no substantiation
for these amounts beyond the pro forma returns.

[12]John Pritten testified that petitioner's "loans" are
reflected on the Schedules L under headings different from "Loans
from stockholders".  He testified that the headings "Mortgages,
notes, bonds payable in less than 1 year" and "Mortgages, notes,
bonds payable in 1 year or more" also reflect petitioner's
"loans".  Although it is true that these headings list
substantially more than the stockholder loans category and that
some of the amounts listed on the Schedules L equal the face
amounts of the promissory notes, we do not find this testimony
persuasive.  Each of the promissory notes has a 1-year maturity
date.  This contradicts the distinction between notes payable in
1 year or more and notes payable within less than 1 year.  For
example, GAPS note No. 6 for $31,637 is exactly the same amount
as the GAPS Schedule L entry under notes payable in less than 1
year for 12/31/88 although note No. 6 is payable in one year.
Also, neither Mr. Pritten nor petitioner provided a sufficient
business reason for separating any shareholder loans into the
three different categories.  We find it much more plausible that
Mr. Pritten and petitioner created the notes in preparation for
trial and had to rely on the other Schedule L categories for the
appropriate amounts because the amounts actually stated in the
shareholder loans category were not sufficient to cover the
amounts of the loans claimed.

The notes were not reduced in 1989 by amounts commensurate with the alleged loan repayments. The 1989 GAPS notes, Nos. 5 through 7, equal $128,181, whereas the 1990 GAPS notes, Nos. 8 through 10, equal $64,028. This illustrates a reduction in total loans for GAPS in 1989 of $64,153, compared with the total amount of GAPS payments to petitioner of at least $104,564. This still leaves a difference of more than $40,000.

The JJM calculations show similar discrepancies. The 1989 JJM notes, Nos. 3 and 4, equal $73,381, whereas the 1990 JJM notes, Nos. 5 and 6, equal $59,589. This would indicate a reduction in total loans for JJM in 1989 of $13,792, compared with the total amount of JJM payments to petitioner of at least $39,553, leaving a difference of more than $25,000. There is no evidence that petitioner lent GAPS or JJM any cash or property in 1989 that would account for these differences.[13] The lack of correlation between the face amounts of the notes and the amounts shown on the pro forma Schedules L belies petitioner's position.

We conclude that petitioner's transfers to GAPS and JJM constituted equity investments rather than debt. Therefore, the amounts that GAPS and JJM paid to petitioner, or on his or his family's behalf, were not repayments of shareholder loans but

---

[13]Petitioner claimed that the Mass Mutual payments account for some of this difference. However, we have already taken the Mass Mutual salary check and payments into account in reducing the amount of the total corporate payments.

rather payments with respect to petitioner's stock.  (See infra pp. 27-30 for a discussion of petitioner's basis in GAPS and JJM by virtue of these contributions.)

### (c) Tax Treatment of Corporate Distributions

Section 301 provides a three-tiered sequence for determining the tax treatment of corporate distributions.  Sec. 301(c). First, the distributions are dividends, as determined under section 316, to the extent of the corporation's earnings and profits.  Sec. 301(c)(1).  Second, further distributions are nontaxable returns of capital to the extent of the shareholder's basis in the stock of the corporation.  Sec. 301(c)(2).  Third, further distributions are capital gain to the extent they exceed the shareholder's basis in his stock.  Sec. 301(c)(3).

Corporate distributions are dividends to the extent of corporate earnings and profits.  Sec. 316.  The parties stipulated to using current earnings and profits only. Respondent contends that GAPS's and JJM's 1989 current earnings and profits were $65,367 and $22,257, respectively.  Petitioners contend that GAPS's 1989 earnings and profits were between $51,174 and $65,376, and that JJM's 1989 earnings and profits were between $17,664 and $23,365.

Petitioners did not explain the factors that created the ranges of earnings and profits argued in their briefs.  They did, however, argue that certain items, such as accrued taxes,

interest on the corporate tax deficiencies, and ordinary and necessary business expenses, disallowed for lack of section 274 substantiation, reduce earnings and profits.

Petitioners contend that accrued taxes reduce current earnings and profits, Commissioner v. James, 49 F.2d 707 (2d Cir. 1931); Stern Brothers & Co. v. Commissioner, 16 T.C. 295 (1951), and respondent has not argued otherwise.  Respondent calculated and took into account the accrued taxes in determining the corporations' earnings and profits.

Petitioners are correct that accrued interest on taxes should be accrued ratably each year as it becomes due.  Stark v. Commissioner, 29 T.C. 122, 128 (1957).  However, the interest did not become due until the returns for 1989 were due, March 15, 1990.  Therefore, the GAPS and JJM earnings and profits for 1989 cannot be reduced by the interest due on the tax deficiencies in issue.  Id.

We have already found that petitioner failed to meet the substantiation requirement of section 274 regarding his travel and entertainment expenses, and we find that he has failed to prove that the travel and entertainment expenses were ordinary and necessary business expenses.  Therefore, the earnings and profits of GAPS and JJM should not be reduced by the amounts of the purported travel and entertainment expenses, which will be

aggregated with the other payments for petitioner's benefit as corporate distributions.

The parties are in agreement that GAPS was not a de jure corporation until March 1989. Petitioners also argued that GAPS was not a de facto corporation before the date of incorporation. Although petitioners did not explain the effect of this argument on their case, we assume that petitioners' argument is that earnings of the group employee benefit plan business carried on in the name of GAPS during January and February 1989 could not increase earnings and profits because GAPS was not in existence.[14] Petitioners' argument also implies that any GAPS's payments to petitioner during January and February could not be corporate distributions because GAPS had no corporate existence during that period.

Petitioners' argument is not persuasive. An enterprise that conducts business in a corporate manner and files U.S. corporation income tax returns may be subject to income tax, even if its incorporation was ineffective under State law. United

_____

[14]Petitioners' argument could be a two-edged sword. First, it would seem to rule out any decrease in GAPS's earnings and profits during January and February 1989 because the corporation was not in existence. Therefore, if GAPS had more expenses during January and February than income, the earnings and profits of GAPS for 1989 would actually be higher if we were to find that GAPS was not in existence during those 2 months. Second, if GAPS was not taxable as a corporation between Jan. 1 and Feb. 28, 1989, then the income for those 2 months should be taxable as sole proprietorship income on the Mancusos' personal return. They reported no such income on their 1989 Form 1040.

States v. Scornavacco's Restaurant, Inc., 528 F.2d 19, 23 (7th Cir. 1975) (citing with approval United States v. Theodore, 479 F.2d 749, 753 (4th Cir. 1973)). Petitioner consistently treated GAPS as an incorporated entity beginning in 1986. Petitioner also caused corporate tax returns to be filed during the prior periods when he now argues GAPS was not in existence. On its 1989 pro forma tax return, GAPS claimed, and respondent allowed, a net operating loss deduction carried forward from its 1988 return. Petitioner held GAPS out as a corporation. Therefore, regardless of the status of GAPS under Illinois law for the period January-February 1989, we will treat GAPS as a corporation for Federal income tax purposes for the entire calendar year.

Petitioners have also failed to provide evidence of how expenses and distributions should be allocated between the sole proprietorship and the corporation. Therefore, we will make no adjustment to the amount of GAPS's earnings and profits, or GAPS's corporate distributions, based on petitioners' corporate existence argument. In light of petitioners' failure to prove otherwise, we accept respondent's calculations of the 1989 earnings and profits of both JJM and GAPS.

Under section 301(c)(2), the amount of distributions in excess of earnings and profits is a non-taxable return of capital to the extent of petitioner's basis in the stock. We therefore must determine petitioner's basis in the stock of his

corporations.  The burden is on petitioner to prove his basis in the corporations at the time of the distributions.[15]

On the GAPS Schedule L, $1,000 is shown as petitioner's original capital contribution.  Respondent has conceded this amount, so petitioner's basis in GAPS is at least $1,000. Petitioner claims that he lent the proceeds of two bank accounts, totaling $154,000, to GAPS.  While we have found that these amounts were not loans, we do believe that petitioner transferred these accounts to GAPS.  However, petitioner has failed to prove that he had a sufficient interest in the funds in these accounts to give him any basis in the accounts, or in his GAPS stock after

---

[15]Petitioners, in their reply brief, argued that respondent has the burden of proof on the issue of petitioner's basis because this is a new issue raised by respondent.  However, we disagree with petitioners' contention that this is a new issue. Respondent, in her statutory notice, determined that this case dealt with GAPS's and JJM's constructive dividends.  The statutory notice did not address petitioner's basis in the corporations because respondent assumed that earnings and profits were sufficient to cover the amount of distributions.  After concessions, it became clear that this was not the case.  This change in the factual framework does not render the issue of petitioner's basis a new issue.  The issue of corporate distributions, which is the broad issue in this case, encompasses the need to determine petitioner's basis in the corporation. Sec. 301, the controlling Code section, requires knowledge of a taxpayer's basis in the corporation in order to determine the taxpayer's return of capital and capital gain.  Once the issue of corporate distributions was raised in the statutory notice, the burden was on petitioners to prove all the facts relevant to that inquiry.  This not only included the burden of proving loans, which petitioners spent most of their efforts on, but it also included the burden of proving the amounts of the corporate distributions, the corporations' earnings and profits, and petitioner's basis in the corporations.

the contribution. Petitioner testified as follows regarding these bank accounts:

> Well, [the] claims [account] was strictly a function where we received funds from clients to administer and pay their employee benefit plans. The monies flowed from the employer through our system and bank directly to employees and providers. The other account, or the premium account, was a collection account where we were doing billings to employers, collecting premiums, and remitting net premiums, which are premiums minus commissions and fees, expenses, to insurance carriers. So one went from employer to insurance carriers and one went from the employer to providers.

Petitioner's testimony indicates that these accounts were flow-through accounts, perhaps even trust accounts. The funds were collected from one source and paid to another. If this is so, whatever funds were in the accounts at the time of transfer were subject to the corporate liabilities to the designated distributees of the funds. Petitioners have not presented any evidence that these funds actually had a basis to petitioner, net of liabilities, when he transferred them to GAPS. We conclude, therefore, that petitioner's basis in GAPS cannot be increased by the amounts of the two bank accounts.

Petitioner also claims to have lent $100,000 in furniture and equipment to GAPS. We have already found, supra p. 23, that petitioner has failed to prove that he lent this property to GAPS. Although we believe that petitioner transferred the furniture to GAPS, petitioner's basis in GAPS cannot be increased by any amount for this contribution, because he has not proven

what his basis in the assets was at the time of contribution.[16] After considering all of the evidence, we conclude that petitioner's basis in GAPS was $1,000.

On the JJM Schedule L, $1,000 is shown as petitioner's original capital contribution. Petitioners also claim that petitioner transferred the proceeds of a bank account, totaling $20,000, to JJM. We do believe that this account was transferred. Unlike the GAPS accounts, there is no indication that this account was a flow-through account. Therefore, petitioner's basis in JJM was increased by the bank account contributed. Petitioner also claims to have transferred $37,000 in furniture and equipment. Although we believe that petitioner contributed this property to JJM, petitioners have not proven what petitioner's basis in the assets was at the time of contribution. There is insufficient evidence to justify increasing petitioner's basis by any amount on account of this transfer.[17]

---

[16]We note that petitioners could have argued that the Cohan rule may be used to estimate petitioner's basis in the furniture and equipment at the time of transfer. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). However, even if petitioners had raised this argument, they would have had to provide some reasonable evidentiary basis for estimating petitioner's basis under Cohan. Polyak v. Commissioner, 94 T.C. 337, 345-346 (1990); Vanicek v. Commissioner, 85 T.C. 731, 743 (1985). Petitioners failed to do so.

[17]See supra note 16.

Petitioners also claim that petitioner transferred $16,000 in accounts receivable to JJM. Petitioner was a cash basis taxpayer. A cash basis taxpayer has a zero basis in accounts receivable. Raich v. Commissioner, 46 T.C. 604, 610 (1966); see also P.A. Birren & Son v. Commissioner, 116 F.2d 718, 720 (7th Cir. 1940). Therefore, petitioner's contribution of the accounts receivable has no effect on his basis in JJM. After consideration of all of the evidence, we conclude that petitioner's basis in JJM was $21,000.

Finally, section 301(c)(3) treats the amount of the distribution, not treated as a dividend, to the extent it exceeds basis, as gain from the sale or exchange of property. This calculation we leave to the parties under Rule 155.

Issue 3. Additions to Tax and Penalty

(a) Section 6651(a)(1)--All Petitioners

Section 6651(a)(1) provides, in the case of failure to file a return by the due date, that the taxpayer is subject to an addition to tax in the amount of 5 percent of the tax for each month, or fraction thereof, that the delinquency continues (not to exceed 25 percent), unless it is shown that such failure is due to reasonable cause and not willful neglect.

Petitioners' 1989 joint individual income tax return was due April 15, 1990. Sec. 6072(a). On August 30, 1990, the Internal Revenue Service received the individual petitioners' 1989 joint

return, Form 1040, dated August 15, 1990, with a postmark of August 28, 1990.

Petitioners' (GAPS and JJM) 1989 U.S. Corporation Income Tax Returns, Forms 1120, were due on March 15, 1989. Sec. 6072(b). The Internal Revenue Service did not receive GAPS's and JJM's Forms 1120 until September 20, 1992. These forms were hand delivered, were not signed, and were undated. Petitioners claim that these Forms 1120 were mailed, along with the Form 1040, at the end of August 1990.

Neither the individual nor the corporate petitioners requested extensions to file their Federal income tax returns for the taxable year 1989. The regulations tell how to count the number of delinquent months. Sec. 301.6651-1(b), Proced. & Admin. Regs. If the filing date is a day other than the last day of a month, the period that terminates with the date numerically corresponding thereto in the succeeding calendar month and each successive period shall constitute a month for purposes of section 6651. Sec. 301.6651-1(b)(2), Proced. & Admin. Regs. As of August 15, 1990, the corporate returns were already 5 months delinquent; as of August 16, the individual return was 5 months delinquent because any fraction of a month counts as an entire month for section 6651 purposes. Sec. 6651(a)(2). Therefore, even if all the returns were mailed on August 28, as petitioners assert, they are subject to the 5-percent-per-month addition to

the tax due, or the maximum 25 percent of the tax due, unless petitioners had reasonable cause for the delay.

Petitioners bear the burden of proving that the delay was due to reasonable cause and not willful neglect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioners presented no evidence regarding the reasons for their delay in filing (or failure to file) their returns. Petitioners have not met their burden of proving that the delay was due to reasonable cause and not willful neglect. Therefore, we hold for respondent on this issue.

### (b) Section 6662(b)(1)--Jerome J. and Joanne L. Mancuso

Section 6662(b)(1) provides that, if any part of any underpayment of income tax is due to negligence or disregard of the rules or regulations, an accuracy-related penalty equal to 20 percent of the underpayment is added to the tax. Respondent's determination is presumed correct, and the burden is on petitioners to prove that they were not negligent. Accardo v. Commissioner, 942 F.2d 444, 452 (7th Cir. 1991), affg. 94 T.C. 96 (1990). The Mancusos presented no evidence on this issue, nor did they argue this issue in either their opening or reply briefs.

Negligence has been defined as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Id. (citing Marcello v.

Commissioner, 380 F.2d 499, 506 (5th Cir. 1967); Neely v. Commissioner, 85 T.C. 934, 947 (1985)). Petitioner is an experienced businessman and insurance agent. There is evidence in the record that petitioner through GAPS created and maintained a fairly complex record-keeping system to document and administer the employee benefit programs of his business clients. However, when it came to his own affairs and those of his wholly owned corporations, petitioner did not institute and implement similar procedures for creating and maintaining documentation. Petitioner never produced any loan source documents, nor did he provide sufficient substantiation of the purported business travel expenses through contemporaneous records or otherwise.

Petitioner used his corporations as his personal pocketbooks, paying both his and his family's personal and living expenses out of the corporate till. He not only failed to include these amounts in his gross income, but he also deducted many of the same amounts from the income of his corporations. We do not believe petitioner's actions and omissions were reasonable. In light of his actions and omissions, and with no argument or evidence presented by petitioner to the contrary, we sustain respondent on this issue.

### (c) Section 6655--GAPS and JJM Estimated Tax Additions

The final issue is whether GAPS and JJM are liable for the addition to tax under section 6655 for failure to pay estimated

income tax for 1989.  Petitioners have the burden of disproving respondent's determination.  Rule 142(a).  Inasmuch as petitioners introduced no evidence to disprove or rebut respondent's determinations, we sustain them.

To reflect the foregoing,

<u>Decisions will be entered under</u> <u>Rule 155</u>.